DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Lucas county Court of Common Pleas, Juvenile Division, which granted permanent custody of Keiondre S. to the Lucas County Children Services Board ("LCCS") and terminated the parental rights of appellant, Stacie S. and of Leon B.[1] For the reasons stated herein, this court affirms the judgment of the trial court.
 {¶ 2} Appellant, Stacie S., is the biological mother of Keiondre S. (born 2001). On August 29, 2003, LCCS filed a "complaint in dependency: permanent custody" and a motion for a shelter care hearing. The complaint alleged that appellant was mentally retarded and unable to care for Keiondre's needs without constant supervision. According to the complaint, appellant had previously lost permanent custody of three other children due to her mental limitations. On September 2, 2003, the juvenile court awarded temporary custody of Keiondre to LCCS.
 {¶ 3} An adjudication hearing commenced on November 4, 2003. Karen Mieczkowski, a service and support specialist for the Mental Retardation and Developmental Disabilities Board ("MRDD"), testified that she counseled appellant. Mieczkowski testified that appellant has an IQ of 53 indicating moderate retardation. Mieczkowski's professional involvement with appellant took place from 1997 until 1999 and again, after Keiondre's birth, from December 2001 until March 2002. Mieczkowski testified that in her opinion, appellant could not live independently. As for appellant's relationship with Keiondre, Mieczkowski observed that appellant had to be constantly reminded to watch the child.
 {¶ 4} Heather Shupe testified that she is an interactive parenting instructor at St. Vincent's Hospital in Toledo, Ohio. In her classes, parents and children interact with each other while Shupe monitors their behavior. Appellant and Keiondre attended these classes in the summer of 2004. Shupe described appellant's interaction with Keiondre as "minimal." Shupe explained that she often had to verbally direct appellant to attend to Keiondre when, for example, he climbed dangerously high on something to retrieve a toy or when he forcibly took toys from other children. Shupe testified that appellant was so slow to respond to verbal direction that often, Shupe herself, for safety reasons, would have to attend to Keiondre. Shupe stated that she never saw appellant independently initiate a response to such situations with Keiondre. According to Shupe, Keiondre is a very active, very intelligent toddler and appellant's inability to respond swiftly to his behavior puts the child at physical risk in that he is essentially unsupervised when in appellant's care.
 {¶ 5} Andreinna Rivera testified that from February 2002 until September 2003, she worked as a service coordinator for "Help Me Grow," a social services program that works with families who have young children. The program mainly attempts to link families with the various resources available to them in their community. Rivera testified that she worked with appellant and Keiondre when she was employed with "Help Me Grow." Appellant attended parent meetings and play groups that were sponsored by the program. Rivera testified that there was limited verbal communication between appellant and Keiondre and that appellant relies on others to parent Keiondre. During her involvement with appellant, Rivera noted that there was a lack of family support behind appellant. Though appellant lived with various family members at various times, Rivera described the situations as "chaotic" and "unstable" adding that she was never sure who in the family was assisting appellant at any given time. Rivera testified that Keiondre is a somewhat aggressive, smart child who frequently challenges appellant. Rivera testified that that roles of parent and child where often reversed when it came to appellant and Keiondre.
 {¶ 6} Cicely Strickland, an MRDD employee, testified that she saw appellant and Keiondre weekly for about a year when they attended the board's play group. Strickland testified that she frequently had to remind appellant to correct Keiondre when he misbehaved, such as when he hit other children. She also had to constantly tell appellant to follow two year-old Keiondre as he was playing. If Keiondre needed a diaper change, appellant would have to be told to change his diaper. Strickland testified that appellant never internalized the instructions and never once attempted to parent Keiondre unless she was prompted by someone else. Strickland also visited appellant at her home. Strickland described an incident wherein Keiondre opened a gate and ran down the driveway toward the street. Appellant stood and watched as Strickland ran after Keiondre and brought him back to the house. Strickland testified she then explained to appellant that she should chase after Keiondre if he ever attempted to run into the street again. In July 2003, Strickland increased the number of her home visits in the hope that appellant would improve her parenting skills. Despite the increased attention, Strickland saw no noticeable improvement in appellant's parenting skills. Strickland testified that Keiondre would be at great risk if appellant is given the responsibility of taking care of him.
 {¶ 7} Following the above testimony, the court adjudicated Keiondre a dependent child. Without objection, the court immediately began the dispositional hearing. Clinical psychologist, Dr. Jason Dura, testified that he met with appellant on three occasions for purposes of evaluating her regarding the permanent custody motion. Dr. Dura testified that he found appellant to be functioning in the moderate range of mental retardation caused by Reyes Syndrome. In evaluating appellant, Dr. Dura asked her some general parenting questions such as "what would you do if your child were to become ill" and "how do you know when your child is hungry." Dura testified that appellant was unable to answer without prompting from social workers. She exhibited no ability to identify the issue and to independently produce an answer. Observing appellant with Keiondre, Dr. Dura noted that appellant was very slow to react to any problem, to the extent she reacted at all. She also displayed an inability to concentrate on more than one task at hand. Dura explained that while that may not necessarily always be dangerous, it is a problem for someone taking care of a young, extremely active toddler. For example, if Keiondre decided to run outside into the street while appellant was talking on the phone, she would not recognize that Keiondre was in immediate need of her attention and that the phone call could wait. Dr. Dura testified that appellant is a committed mother who loves her child, however, "there's capacity issues * * * that just get in the way." According to Dr. Dura, it would not be safe for Keiondre to be in appellant's custody.
 {¶ 8} LCCS employee, Chanda Edinger, testified that she was appellant's caseworker. She testified that Keiondre was currently living in a foster home with his three biological siblings and that the foster parents had expressed a willingness to adopt Keiondre. Edinger testified that she believed it to be extremely important for Keiondre to have consistency and to live in a stable home given the fact that, at his young age, he has been exposed to numerous caregivers such as family members and individuals employed by the various agencies that attempted to help appellant.
 {¶ 9} Lyn Lipscomb testified that appellant and Keiondre lived with her for three months in 2003. Lipscomb served as appellant's respite care provider meaning that she provided a temporary home for appellant until the MRDD found her a permanent home. Lipscomb testified that appellant and Keiondre were in her care for twenty-four hours a day, seven days a week. Lipscomb testified that she saw appellant feed and play with Keiondre. She testified that appellant also changed Keiondre's diaper. The only problem Lipscomb ever had with appellant was that appellant often failed to clean up after Keiondre.
 {¶ 10} Valerie Mathis testified that she is a "living provider" for the Luther Home of Mercy. The home provides social services for clients referred to them by various agencies. Mathis' job was to provide appellant with transportation for anything she needed. During her involvement with appellant, Keiondre was in foster care. Mathis testified that she took appellant to LCCS to visit Keiondre twice a week for approximately two months. Lipscomb testified that on these visits, she watched appellant and Keiondre interact together. Lipscomb testified that she was never concerned for Keiondre's safety when he was with appellant.
 {¶ 11} Vickie Robinson, an MRDD employee, testified that she too accompanied appellant on her visits to LCCS for purposes of visiting Keiondre. Robinson testified that appellant and Keiondre played together and that Keiondre obviously enjoyed being with his mother. Robinson testified that on the four occasions she witnessed the visits, appellant never needed assistance or "prompting" from another before attending to Keiondre's needs.
 {¶ 12} Sharon Calhoun, also an MRDD employee, testified that she has observed appellant's interactions with Keiondre. Calhoun testified that appellant was "appropriate" with Keiondre. She testified that she had watched appellant, (1) ride a bike with Keiondre, (2) correct Keiondre when he attempted to climb a fence and, (3) prevent Keiondre from touching the personal property of others. Calhoun testified that her only concern is that appellant would be unable to fill out a medical form in the event Keiondre got sick.
 {¶ 13} The guardian ad litem submitted a report stating "I do not believe it is in [appellant's] best interest to be responsible for a child when she does not have the mental capability to raise a child." In his report, he detailed the numerous social services appellant receives through various agencies. Appellant receives help with grocery shopping, transportation, bill paying and housing. Noting that appellant is supervised by a social worker 55 hours a week and that "everything is done for her", the guardian concluded that it would be reasonable to assume that anyone requiring that many services is not competent to care for a child.
 {¶ 14} On January 15, 2004, the court granted LCCS's motion of permanent custody. Appellant now appeals setting forth the following assignments of error:
 {¶ 15} "I. The trial court erred in finding that the lucas county children services board had made a reasonable effort to reunify the minor child with appellant.
 {¶ 16} "II. The trial court erred in granting state's motion for permanent custody as it was against the manifest weight of the evidence to grant it.
 {¶ 17} In her first assignment of error, appellant contends that the court erred in finding that LCCS had made reasonable efforts to reunify the minor child with appellant.
 {¶ 18} Pursuant to R.C. 2151.419, the agency which removed the child from the home must have made reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the home, or make it possible for the child to return home safely. The statute assigns the burden of proof to the agency to demonstrate it has made reasonable efforts.
 {¶ 19} LCCS provided case plan services which included services through MRDD. Appellant received assistance 55 hours a week. MRDD provided her with a job coach, a vocational specialist, parental education classes and assistance with daily living skills such as housekeeping, money management, grocery shopping and transportation. MRDD also provided appellant with housing. Numerous attempts were made by the various agencies to teach appellant how to care for her child. Despite these efforts and the obvious commitment of many professionals, the record shows that appellant's parenting skills never improved. Accordingly, appellant's first assignment of error is found not well-taken.
 {¶ 20} Appellant next contends that the court's granting of the motion for permanent custody was against the manifest weight of the evidence. An appellate court will not overturn a permanent custody decision as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established. In re S. (1995), 102 Ohio App.3d 338,344-345.
 {¶ 21} Ohio courts have long held that a parent who is a suitable person has a paramount right to the custody of his or her child. Clark v. Bayer (1877), 32 Ohio St. 299, 310; In rePerales (1977), 52 Ohio St.2d 89, 97, In re Murray (1990),52 Ohio St.3d 155, 157. For this reason, a court, "* * * may not award custody to [a] nonparent without first making a finding of parental unsuitability * * *." In re Perales, syllabus. Such a requirement still exists, In re Sara H. (Dec. 16, 1994), 6th Dist. No. L-94-116, but has been statutorily defined.
 {¶ 22} R.C. 2151.414 provides that a parent's rights may not be terminated unless the court finds evidence that 1) the child, "* * * cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent," R.C.2151.414(B)(2), and 2) that a grant of permanent custody of a child to a children's service agency is in the child's best interests. R.C. 2151.414(B)(1). The statute sets forth a list of 16 predicate findings, one of which must be established prior to a judicial conclusion that a child cannot or should not be placed with the child's parent. R.C. 2151.414(E); In re William S.
(1996), 75 Ohio St.3d 95, syllabus. The statute also enumerates certain criteria for evaluating whether permanent custody with a children's services agency is in the child's best interests. R.C.2151.414(D)(1) through (4). All of the court's findings must be supported by clear and convincing evidence, R.C. 2151.414(B), and will not be overturned as against the manifest weight of the evidence if the record contains competent credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established. In re Forest S. (1995),102 Ohio App.3d 338, 345-346; Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 23} In this matter, the trial court found that Keiondre cannot and should not be returned to the care of either of his parents and that it was in his best interest to grant the motion for permanent custody. The court also found that R.C.2151.414(E)(2) and (11) were proven. In material part, these provisions provide:
 {¶ 24} "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section2151.353 [2151.35.3] of the Revised Code;
 {¶ 25} "11) The parent has had parental rights involuntarily terminated pursuant to this section * * *"
 {¶ 26} In its judgment entry, the court stated in pertinent part:
 {¶ 27} "Expert testimony was presented that [appellant] is moderately mentally retarded. Her mental retardation is believed to be the result of a [sic] organic brain injury secondary to a childhood illness, Reyes Syndrome. [Appellant] functions at approximately a 7 ½ to 8 year old level. Expert opinion was presented that [appellant's] intellectual deficits make it impossible for her to parent safely. Further, [appellant's] mental retardation is chronic and her parenting ability is not subject to change."
 {¶ 28} After a thorough review of the record in this case we conclude that the trial court's decision was supported by some competent, credible evidence and, therefore, was not against the manifest weight of the evidence. Appellant's second assignment of error is found not well-taken.
 {¶ 29} On consideration whereof, this court finds that substantial justice was done the party complaining, and the judgment of the Lucas Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the costs of this appeal. See App.R. 24.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, P.J., Singer, J., Knepper, J., concur.
[1] LCCS was unable to locate the whereabouts of Leon B.